*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-FS-1583

IN RE A.W., APPELLANT,

Appeal from the Superior Court of the
District of Columbia
(DEL-71-11)

(Hon. Milton C. Lee, Trial Judge)

(Argued November 20, 2013                           Decided June 12, 2014)

*Shirin Ikram* for appellant.

*Janice Y. Sheppard*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, and *Todd S. Kim*, Solicitor General, and *Rosalyn Calbert Groce*, Deputy Solicitor General, were on the brief, for appellee.

Before GLICKMAN, *Associate Judge*, and SCHWELB and KING, *Senior Judges*.

Opinion of the court by *Senior Judge* SCHWELB.

Dissenting opinion by *Senior Judge* KING at page 20.

SCHWELB, *Senior Judge*: Following protracted evidentiary hearings in the Juvenile Branch of the Superior Court's Family Division, A.W. was adjudicated a delinquent on the basis of his alleged commission of assault with intent to rob (AWIR) and misdemeanor malicious destruction of property (MDP). The trial

judge placed A.W. on juvenile probation for four months. On appeal, A.W. contends, *inter alia,* that the judge erred in denying A.W.'s motion to suppress statements and identification evidence and in prohibiting the defense expert witness from expressing an opinion as to the reliability of the victim's identification of A.W. as his assailant. A.W. also claims that the evidence was insufficient as a matter of law to prove his guilt beyond a reasonable doubt. Primarily in light of the victim's own unequivocal testimony that the person shown in a photograph taken of A.W. less than three hours after the offense was not the person who attacked him, we agree with A.W.'s final claim, and we reverse the judgment without reaching or deciding the other issues that he has raised.

## I. THE EVIDENCE

In September 2011, the trial court initially heard testimony on A.W.'s motion to suppress. On September 28, the judge denied the motion. A.W.'s bench trial followed, and the evidence from the motions hearing was made a part of the trial record. The judge granted A.W.'s motion for judgment of acquittal on a charge of aggravated assault, but at the conclusion of the trial he found A.W. guilty of AWIR and MDP.

The evidentiary record in this case is quite extensive, but in this opinion we confine ourselves to a discussion of that part of the evidence that informs our decision with respect to the issue that we view as dispositive. Issues relating to other evidence have been the subject of extensive disagreement and argument between the parties, but we find it unnecessary to address them.

On December 27, 2010, at about 5:10 p.m., Roger Gorke was sitting on a Metro train, listening to music and sending text messages on his cell phone. At the Gallery Place station, four young black persons in their teens or early twenties boarded the train. They appeared to be together, and they attracted his attention because some of them were being "rather loud." Two or more of the members of this group appeared either to be female or cross-dressing males. There is no doubt that the young people were on the train for several minutes and that Mr. Gorke had ample opportunity to, and did, observe them. In particular, he watched and made eye contact with a young member of the group who had short hair, who was not dressed in women's clothing, and who had been seated opposite the exit doors of the train, facing him.

Just before the train arrived at Union Station, the group gathered near the exit. At this point, the young man who had been sitting opposite Mr. Gorke tried to grab Mr. Gorke's cell phone. Mr. Gorke testified that he "hung on and we were — his momentum of pulling, trying to get the phone, was pulling me out of the train." During the struggle, Mr. Gorke was struck on the head from the side by someone (not the would-be phone thief) whom Mr. Gorke apparently did not see, and Mr. Gorke ended up on the ground on the platform, bruised and bleeding. The assailant released the cell phone, which was damaged as a result of the fracas.

Officer Thaddeus Ferguson, III of the Metropolitan Police Department responded to Union Station, arriving at about 5:30 P.M. After interviewing Mr. Gorke, the officer broadcast a lookout for two black males, one of whom was described as a transgender male with a long curly wig, thigh high boots, jeans, and a dark jacket. Ferguson testified that, in his subsequent report, he identified A.W. in a Metro surveillance video of the scene shortly after the incident, District Exhibit 5, as a person with a wig and long boots. Nothing in the video suggests that this person, who was one of a group of passengers walking down the platform, had been involved in an altercation with Mr. Gorke, who was on the ground.

Mr. Gorke was transported to Howard University Hospital. At the hospital, Mr. Gorke was interviewed by Detective Colin Dorrity of the Metropolitan Police Department. After relating what had occurred on the train, Mr. Gorke provided the following description of the person who had been seated opposite to him, facing him and who had tried to take his phone: between seventeen and twenty-two years of age, approximately 5'9" in height, with close-cut hair and a tan coat. He described a second member of the group, who had been sitting parallel to him—not the would-be phone-snatcher—as being a transvestite or cross-dresser, six feet in height, with a muscular build, a curly wig or hair, wearing a purple coat, tight jeans, and boots.

Later that evening, Officer Ferguson, who had been canvassing the area, stopped four young people at the Gallery Place Metro Station who appeared to match Mr. Gorke's description of the group. According to Ferguson, one of the four, who turned out to be A.W., spontaneously stated that "we didn't do anything to that white man. He fell on his own. We didn't do anything to that man at Union Station." Ferguson stated that A.W. had a lace-front wig, and he was wearing a dark purple coat, jeans, and long boots, thus matching the description of the non-snatcher in the lookout. The officer detained two of the men, including A.W., until

after a warrant check disclosed that they were not wanted by the police, at which point they were released. However, Officer Ferguson identified a photograph which was admitted as District's Exhibit 8 as accurately representing A.W.'s appearance when he was stopped at Gallery Place, and the officer made an in-court identification of A.W. without defense objection. Officer Ferguson also testified that he had seen A.W. on a number of other occasions and that he was always dressed as a woman, with curly hair or a wig.

Based on the information available to him, Detective Dorrity prepared a photo array to display to Mr. Gorke. The photograph of A.W. included in the array was two years old, and it came from another detective's investigation of activities of a gang which had allegedly committed similar crimes, and with which A.W. was suspected of being connected.[1] When the array was shown to Mr. Gorke ten days after the assault, he pointed to the photograph of A.W. and stated that "this man right here, I recognize him." He said that he specifically recalled the "almond-

---

[1] Counsel for A.W. objected vigorously to the use of this photograph as a part of the array and to testimony regarding how it was obtained and selected. Because of our disposition of this appeal on other grounds, we do not address this issue. For purposes of this opinion, we assume, without deciding, that the photo array and the testimony relating to it were properly admitted.

shaped eyes" and that "this is the person that grabbed my phone." At the trial, but before he was shown District's Exhibit 8, Mr. Gorke identified A.W. in court as his assailant.

Detective Dorrity also conducted a videotaped interview with A.W., relevant parts of which were played at trial. In the video, which was admitted as District's Exhibit 11, A.W. confirmed much of Mr. Gorke's account. Although A.W.'s description of his location on the train, in relation to where Mr. Gorke was sitting, was conveyed in substantial part by hand gestures and is not entirely clear, he indicated that he and his nephew had been sitting across the aisle from Mr. Gorke, apparently facing in the same direction. When told by the Detective that Mr. Gorke claimed that the two of them made eye contact, A.W. did not deny that this was possible. He insisted, however, that he did not snatch the phone or strike Mr. Gorke. Rather, he stated that it was one of the other three boys that tried to take the phone, and a "fat" boy who struck Mr. Gorke on the head.

After the motion to suppress was denied,[2] Mr. Gorke was re-called to the

---

[2]  The defense case consisted primarily of the extensive testimony of its expert witness on eyewitness identification. A.W. relies, *inter alia*, on the expert's

(continued…)

witness stand. In response to questions from counsel for the District, he described his assailant again as "a young African-American, very short hair," and he added that "I really remember the shape of his eyes." Counsel then asked whether "you see that individual in court today," and Mr. Gorke testified that he did, but that this person, who was seated at the defense table, was "dressed very much differently." He stated that "the person, when I saw them [sic], was dressed with a very very short hair, and the hair is significantly different now." On cross-examination, defense counsel asked Mr. Gorke to examine District's Exhibit 8, the photograph of A.W. taken by Officer Ferguson a few hours after the assault. Counsel for the District objected on unstated grounds, but the objection was overruled, and Mr. Gorke testified that he had "never seen this picture before." He stated that the photograph resembled not the assailant with short hair who had been sitting across

---

(…continued)

discussion of "unconscious transference," a theory under which "the accuracy of an eyewitness identification may be undermined . . . when a person seen in one context is confused with a person seen in another." *State v. Guilbert*, 49 A.3d 705, 723 & n.19 (Conn. 2012). In *Heath v. United States*, 26 A.3d 266, 274 (D.C. 2011), a case that featured the same expert witness, we referred to unconscious transference as a "phenomenon (if it exists)," but we reached no conclusion regarding the validity of the theory. Except to note that what appears to have happened in this case might arguably be viewed as consistent with unconscious transference, we need not and do not resolve that issue. *See generally Young v. Conway*, 698 F.3d 69, 81–82 (2d Cir. 2012); *State v. Chapple*, 660 P.2d 1208, 1221 (Ariz. 1983), *superseded by statute on other grounds as stated in State v. Benson,* 307 P.3d 19, 34 (Ariz. 2013).

from him on the train, but rather the "cross-dresser" who had been seated parallel to him, as Mr. Gorke remembered that individual; Mr. Gorke remarked, however, that "that was nine months ago that I saw that person." The following exchange ensued:

Q. So this picture, as far as you remember with nine months behind you, accurately reflects the clothing and the gender impression that you had of that cross dresser?

A. Right.

Q. Correct?

A. Correct.

Q. Now did …

A. *But that's not the person who took my phone.*

Q. *That is not the person who took your phone?*

A. *No, that's correct.*

(Emphasis added). Turning to a key basis on which he had made the in-court identification of A.W.—the almond-shaped eyes—Mr. Gorke reiterated that in the courtroom, as on the scene and in the photo array, "his eyes are very distinctive to me."

On redirect examination by counsel for the District, Mr. Gorke elaborated on his testimony on cross-examination, as follows:

> Q. Mr. Gorke, looking at Government's Exhibit No. 8, tell me about the eyes in that picture.
>
> A. This person's eyes are very round and open.
>
> Q. And how do they compare in your opinion in this picture to the eyes that you remember from the person who took the phone?
>
> A. *The person who took the phone, his eyes were much more closed, and more almond shaped, and more squinty, but not in a pejorative way.*

(Emphasis added). In other words, according to Mr. Gorke, the sole eyewitness who testified against A.W., the photograph of A.W. taken two-and-one-half hours after the assault showed an individual whose appearance, in terms of hair and clothing, was dramatically different from that of his assailant and was not his assailant. The photograph, in terms of gender impression, looked more like the cross-dresser than the short-haired would-be snatcher. In addition, the person in Exhibit 8 did not have the telltale almond-shaped eyes which Mr. Gorke had emphasized in describing the person who tried to steal his phone.

## II.    THE TRIAL JUDGE'S DECISION

After granting A.W.'s motion for judgment of acquittal of the charge of aggravated assault and then summarizing the evidence in some detail, the trial judge adjudged A.W. to be guilty of AWIR and MDP.  Noting Mr. Gorke's selection of A.W.'s photograph from the array within ten days of the assault, which was corroborated by A.W.'s admission that he was on the scene, the judge found the complaining witness to be "very credible" and his identification of A.W. to be reliable.  The judge noted Mr. Gorke's repeated insistence that it was the person with almond-shaped eyes who tried to take his phone.  The judge also emphasized the significant amount of time that Mr. Gorke had to observe A.W., pointing out that at the time of the observation, no crime had been attempted, so that the situation was not unduly stressful.  The judge considered the "unconscious transference" and "illusory conjecture" theories advanced by the defense expert for the proposition that the mind has difficulty in taking things in where multiple persons are involved, see *supra* note 2, but he found them inapplicable because only one person tried to take Mr. Gorke's phone.

The judge acknowledged that Mr. Gorke had described his assailant as having short hair, but that in a photograph taken approximately two and a half hours later, he was (apparently) wearing a wig.[3] The judge also recognized that there were other inconsistencies in the District's case regarding Mr. Gorke's descriptions of the person who attempted to snatch his phone. Nevertheless, the judge found Mr. Gorke's identification of A.W. to be reliable. With respect to the change in appearance, the District took the position that A.W. had time to go home and change his clothing and that he had the motive to do so if he wished to confuse those who might be seeking the perpetrators of the Union Station incident. The judge found it "odd" that A.W. would leave the area where the assault took place and then come back with his appearance changed, but he concluded, without further elaboration, that "I don't have to figure that part of it out."

In announcing his decision, the judge did not focus upon, or specifically allude to, the fact that during his cross-examination, and again on redirect, Mr.

---

[3] Detective Dorrity testified that when he arrested A.W. at his home on January 13, 2011, some seventeen days after the assault, A.W. was dressed as he appeared in the interrogation tape, with long hair. According to A.W., he offered to let the detective pull his hair to confirm that it was not a wig, but the Detective declined the offer. The District claims, however, that A.W. was adjusting a wig when Officer Ferguson stopped him, and the judge evidently believed that A.W. had a wig.

Gorke testified, spontaneously and unequivocally, that the person shown in District's Exhibit 8—a photograph of A.W. taken only a few hours after the assault—was *not* his assailant. The judge also made no mention of Mr. Gorke's testimony that the person in Exhibit 8 appeared to be dressed like the cross-dresser who had been seated parallel to him on the train, but *not* like the short-haired phone-snatcher, nor did the judge make a reference to the Metro videotape, District's Exhibit 5. Finally, the judge did not appear to regard it as significant that the person in the photograph did *not* have a principal and unchangeable trait by which, according to Mr. Gorke, the assailant could allegedly be identified, namely, almond-shaped eyes.

### III.   ANALYSIS

"In evaluating [a] claim[] of evidentiary insufficiency in [a] juvenile delinquency appeal[], we view the record 'in the light most favorable to the [District], giving full play to the trial judge, as the trier of fact, to determine the credibility of the witnesses, to weigh the evidence, and to draw reasonable inferences.'" *In re As. H.*, 851 A.2d 456, 459 (D.C. 2004) (last alteration in

original) (quoting *In re T.M.*, 577 A.2d 1149, 1151 (D.C. 1990)). "Any factual finding anchored in credibility assessments derived from personal observations of the witnesses is beyond appellate reversal unless those factual findings are clearly erroneous." *Stroman v. United States*, 878 A.2d 1241, 1244 (D.C. 2005) (quoting *Hill v. United States*, 664 A.2d 347, 353 n.10 (D.C. 1995)) (internal quotation marks omitted). The evidence may be sufficient to support an adjudication of guilt even when "the finding of guilt rests solely upon the positive identification testimony of a single witness." *Crawley v. United States*, 320 A.2d 309, 311 (D.C. 1974) (citing *United States v. Telfaire*, 152 U.S. App. D.C. 146, 149 n.5, 469 F.2d 552, 555 n.5 (1972)), "so long as a reasonable person could find the identification convincing beyond a reasonable doubt." *Benn v. United States (Benn II)*, 978 A.2d 1257, 1265-66 (D.C. 2009) (quoting *Peterson v. United States*, 657 A.2d 756, 760 (D.C. 1995)) (internal quotation marks omitted).

At the same time, we cannot meaningfully evaluate the sufficiency of the evidence in this case without considering the special legal context in which it arises as a result of extensive judicial experience and scholarly research on the issue. "The vagaries of eyewitness identification, and the potential for wrongful convictions or adjudications based upon such evidence, have long been recognized

in the District of Columbia." *In re As. H.*, 851 A.2d at 459–60 (citations omitted). The sole identification of A.W., as we have noted, was provided by a person who was a complete stranger to him. As we recognized in *Webster v. United States*, 623 A.2d 1198, 1204 n.15 (D.C. 1993) (citations omitted), the positive identification of a person not previously known to the witness is "proverbially untrustworthy," and has been described as "perhaps the most fearful testimony known to the law of evidence." "These judicial pronouncements are supported by research studies that have concluded that eyewitness error is the leading cause of wrongful conviction in the United States." *Benn II*, 978 A.2d at 1265–66 (footnote and internal quotation marks omitted).

We recently had occasion to reiterate that "[a]lthough, in general, reviewing [courts] accord considerable deference to credibility findings by a trier of fact who has had the opportunity to observe the witnesses and assess their demeanor, 'there are certain times when a [reviewing court] must override such a determination by examining evidence in the record that detracts from the [trier of fact's] finding.'" *In re Bradley*, 70 A.3d 1189, 1193-94 (D.C. 2013) (per curiam) (last alteration in original) (quoting *Eilers v. District of Columbia Bureau of Motor Vehicles Servs.*, 583 A.2d 677, 685 (D.C. 1990)); *see also Crawley*, 320 A.2d at 312

(describing the responsibility of the appellate court in reviewing eyewitness identifications); *In re As. H.*, 851 A.2d at 460 n.7 (same). Especially in light of Mr. Gorke's unequivocal testimony that District's Exhibit 8 is not a photograph of his assailant but instead resembles the cross-dresser who was one of the assailant's companions, we are of the opinion that this court's quoted observations in the authorities cited above are relevant here.

We now turn to the application of the foregoing principles to the record before us. Although counsel for A.W. suggests otherwise, the District's case is not without its strengths. There is not the slightest evidence that Mr. Gorke was anything but an honest witness—indeed, the trial judge specifically found him to be credible—and it is undisputed that he had ample opportunity to observe his assailant for several minutes. Mr. Gorke was curious to determine if the person sitting across from him was male or female, which made him pay closer attention than he might otherwise have done. Mr. Gorke's ability to select a two-year-old photograph of A.W. from the photo array, when A.W. was admittedly on the scene of the crime, and no other person in the array was present, tends to support Mr. Gorke's powers of observation. All in all, although the District's affirmative case had its inconsistencies, Mr. Gorke's selection of A.W.'s photograph from the photo

array arguably constituted formidable evidence.

It is undisputed and, indeed, indisputable that A.W. was photographed by the police some two and one half hours after the attempted snatching. Until defense counsel showed him this photograph, District Exhibit 8, Mr. Gorke had never seen it before. When he did see it, and without the slightest hesitation, Mr. Gorke emphatically and spontaneously volunteered that "that's not the person that took my phone." He adhered unequivocally to this testimony when questioned on redirect examination by the attorney for the District. Moreover, the person in this photograph, according to Mr. Gorke, did not have the almond-shaped eyes which Mr. Gorke said he observed on the scene, in the photo array, and in the courtroom.

In addition, the individual photographed in District's Exhibit 8 had long hair or a wig, not the short hair which Mr. Gorke attributed to his assailant. So, too, according to Officer Ferguson, did A.W. in the Metro surveillance video of the scene immediately after the assault. Although the interval of nine months had made it more difficult for him to recall details, Mr. Gorke agreed that Exhibit 8 "accurately reflects the clothing and the gender impression that [he] had of the

cross-dresser." The District speculates that A.W. went home to change his appearance in order to confuse the police in the event that they might be looking for him as a result of the attempted robbery.[4] Since, in his testimony about his report, Officer Ferguson disclosed that in the Metro surveillance video of the scene immediately after the attempted snatching, A.W. was *already* wearing what Ferguson believed to be a wig, the District's suggested scenario is, at best, extremely unlikely. In any event, Mr. Gorke made it clear, both to the police and at the trial, that the cross-dresser was not his assailant. It is conceivable, of course, that when photographed, A.W. was wearing clothes and a wig that made him resemble the cross-dresser. Common sense surely suggests, however, that this is most improbable. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Poulnot v. District of Columbia*, 608 A.2d 134, 139 (D.C. 1991).

The District has not provided us with any persuasive explanation of Mr.

---

[4] In his videotaped statement to Detective Dorrity, A.W. commented, not unreasonably, that if he had committed the offense, it would have made no sense for him to return to the scene.

Gorke's testimony regarding Exhibit 8,[5] and the trial judge does not appear to have attributed any appreciable significance to it. But "the 'reasonable doubt' standard of proof is a formidable one. It 'requires the factfinder to reach a subjective state of near certitude of the guilt of the accused.'" *In re As. H.*, 851 A.2d at 459 (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2004) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979))). In our view, the record simply does not, and cannot, support the requisite "near-certitude" where, as in this case, the sole witness against A.W. has sworn that a photograph of A.W. taken only hours after the offense does not show his assailant but somewhat resembles the cross-dresser who, according to the witness, did not commit the offense. Based on the totality of the evidence and the victim's unequivocal testimony in open court, there is too great a risk that the identification of A.W. was mistaken to support a finding of guilt beyond a reasonable doubt.

---

[5] The District describes its Exhibit 8 as "grainy," a characteristic which is not obvious to us. But even if we assume, *arguendo*, that the District's description is correct, this might perhaps raise or contribute to a reasonable doubt if A.W. had the burden of proving his innocence, but it does little or nothing to help the District to establish A.W.'s guilt beyond a reasonable doubt.

## IV.   CONCLUSION

For the foregoing reasons, the judgment is reversed for insufficient evidence.

*So ordered.*

KING, *Senior Judge*, dissenting:  Because I am persuaded that the able and experienced trial judge carefully and thoughtfully weighed the testimony of the complaining witness, Mr. Gorke, with respect to the identity of his assailant and that the trial judge's assessment of the accuracy and credibility of that identification is so sound that it cannot reasonably be rejected by this court, I respectfully dissent from the majority's determination that the identification fails.

I am in essential agreement with the facts as set forth in the majority opinion.  Both Mr. Gorke in his testimony and appellant, A.W., in his video statement to police after he was taken into custody related that a group of young, black males entered a Metro car at the Gallery Place Metro Station in the early

evening of December 27, 2010. Mr. Gorke, who was sitting next to the wall of the car in the left-most space of a two-person bench seat facing to the rear, testified that there were four males, two dressed as males and two dressed as females. One of the latter, who the witness thought actually could have been a female (hereinafter the "female"), sat next to him to his right and the other sat across the aisle from the female, in the left-most space of another two-person bench seat which extended to the far wall of the car. All three faced to the rear. The second person dressed as a female was described by the witness as a male wearing thigh high boots, a dark coat, jeans, and a long curly wig (hereinafter the "cross-dresser").

One of the male members of the group (hereinafter the "assailant") sat directly in front of Mr. Gorke in the next bench seat to the rear of the train facing forward. The doors to the car—one set on each side—were between the bench seats which were occupied by Mr. Gorke and the assailant. Thus, the two faced each other divided by a space slightly greater than the width of the two doors which is approximately eight to ten feet. Because the group was noisy, Mr. Gorke's attention was drawn to members of the group, particularly the one who was to become the assailant. The fourth member of the group was standing off to

the side and played no apparent role in the events that followed.

Two stops later—approximately three to five minutes elapsed time—the train arrived at Union Station and the members of the group approached the exit doors to Mr. Gorke's right when the assailant grabbed at the phone that Mr. Gorke was holding in his hand. The two then struggled over the phone and, as they edged toward the open doors, Mr. Gorke was struck on the left side of his head causing him to fall out of the car and onto the platform; however, he managed to hold on to his phone. The group of four, as well as other passengers who had exited the train, all dispersed. Nine days later, under circumstances described below, Mr. Gorke viewed an array of nine photos and identified A.W. as the assailant.

A.W., who was taken into custody a week after the photo identification described above, gave a videotaped statement to police. A.W. related a story similar to the one provided by Mr. Gorke with some minor differences and one significant disagreement that goes to the heart of the identification issue on which this case turns. A.W. stated that he and his nephew, both dressed as females, boarded the train at Gallery Place at the same time as a group of three "boys" who all had "short haircuts" and were dressed in male attire. Although the other three

boarded when he and his nephew did, the two groups were not together. A.W. stated that he has seen the other three hanging around, but he did not know their names, although he knew one of them as "J.R." After boarding, his nephew sat in a seat next to a man who had a phone in his hand—Mr. Gorke.

One of the "boys" (assailant) sat in the seat across from, and facing Mr. Gorke, i.e., in the same place where Mr. Gorke testified that the assailant sat. As they were pulling into Union Station, A.W. and his nephew got up to leave and the assailant grabbed Mr. Gorke's phone—A.W. said he and his nephew were the first riders out the doors of the car and Mr. Gorke bumped them from behind as he came onto the platform. A.W. thought that Mr. Gorke had been struck in the head by the chubby member of the group of three "boys" that boarded when he had at Gallery Place. As can be seen, the major difference between A.W.'s version and Mr. Gorke's version of the incident was that while Mr. Gorke identified A.W. as his assailant, A.W. insists that the assailant was one of the three "boys" who boarded the train when he did and that he was the cross-dresser seated across the aisle from the female who was his nephew.

As noted in the majority's fact statement Mr. Gorke was interviewed by

Officer Ferguson and thereafter a lookout went out for two transgender males one of whom was described as wearing a long curly wig, thigh high boots, jeans and a dark jacket. Several hours later Ferguson was at Gallery Place Station where he encountered a group of four people, two of whom met the descriptions of the transgender males who were at the scene. One of them, who turned out to be A.W., without prompting, blurted out: "we didn't do anything to that white man. He fell on his own. We didn't do anything to that man at Union Station."

A photograph was then taken of A.W. which was admitted in the trial court as "GovEx8." It shows a person who is apparently a male wearing jeans, black boots that reach to the knees, a dark jacket reaching to the top of the thighs and curly hair that falls several inches below the top of the shoulders. Officer Ferguson described the hair-do worn by A.W. at the time he was stopped and in the photograph as a wig ("it wasn't natural hair"). After the photo was taken, A.W. was released; however, he was taken into custody a week later after he was identified by Mr. Gorke from a photo array.

After being interviewed by Officer Ferguson, Mr. Gorke was transported to the hospital where, in an interview conducted by Detective Dorrity, he described

the assailant as being between seventeen and twenty-two years old, approximately 5' 9" in height, with close cropped hair and a tan coat. Subsequently, Detective Dorrity prepared a photo array, which included nine black and white photos of young black males with short hair—all of which were mounted on a single sheet that was admitted as GovEx7. When the array was shown to Mr. Gorke on January 6, 2011, he identified the photo of A.W. as the assailant. The photo of A.W. was approximately two years old and his hair was very short—not more than one inch long. Detective Dorrity also possessed a photo of A.W. that was approximately six months old, which was not used in the array because A.W.'s hair had been bleached. That photo, which was admitted during the motions hearing, shows A.W. with hair approximately two inches-long. However, except for the bleached hair, A.W., as depicted in the six month-old photo, closely resembles the photo used in the array.

As previously mentioned, seventeen days after the incident, A.W. was taken into custody and interviewed by Dorrity and another officer which was videotaped and is part of the record on appeal. During the course of the interview, A.W. provided the version of the events on the train and the platform at Union Station set forth above. In the video, A.W. appears to have straight black hair that hangs to

the top of his collar at the sides in the back.  It does not resemble the hair-do worn by A.W. in GovEx 8 which shows hair that is much longer (at least five to six inches longer), curlier and much shinier in color than the hair worn by A.W. in the video.  When A.W. was asked during the interview whether he was wearing a wig the night of the incident he replied:  "No, it was tracks.  I don't wear no wig."  He explained that tracks referred to strands of hair that are "weaved in" to existing hair.  He also stated:  "I can't possibly be putting on a wig since I get tracks put in every time and when he stop me I have tracks in my hair," and "I had black hair, and it was like pinned back.  It was long curls and I had it pinned up in the middle and it was sitting high."  Finally, he said while touching his hair that "at Union Station that night I had long hair like this."

The proceedings in the trial court consisted mainly of matters related to the various motions to suppress.  Like the majority I do not address the rulings by the trial judge on those motions.  It was stipulated that the evidence received during the motions proceedings would apply at trial and after the rulings on the motions, additional evidence was received.  The record includes the testimony of Mr. Gorke (motion and trial), Officer Ferguson (motion), and Detective Dorrity (motion and trial), the videotape of the interview of A.W., the videotape showing the Metro car

arriving at Union Station where the assault occurred, and various exhibits which were discussed above.

The record also includes the testimony of Dr. Lori Van Wallendael, an Associate Professor of Psychology, at the University of North Carolina at Charlotte, whose primary area of specialization for the ten years preceding her testimony had been "memory, specifically as it's applied to forensic situations. So, eyewitness reliability, lineup construction, earwitness or voice recognition and accuracy . . . ." She testified during the motions portion of the proceeding where she was qualified as an "expert on cognitive psychology, human memory with an emphasis on witness reliability."

With one exception, which is discussed below, I am in essential agreement with the majority's summation of the evidence presented in the trial court. In summarizing that evidence the majority concludes: "All in all, although the District's affirmative case has its inconsistencies, Mr. Gorke's selection of A.W.'s photograph from the photo array arguably constituted formidable evidence." While I agree that the identification evidence was formidable, I would not qualify that assessment by describing it to be arguably so, particularly when we examine

the reasons given by the trial judge for concluding that Mr. Gorke's identification of A.W. as the assailant was sufficiently credible for the judge to conclude that the government had proved its case beyond a reasonable doubt.

The trial judge spent a considerable amount of time explaining his reasons for crediting Mr. Gorke's testimony that A.W. was the assailant. In doing so the judge relied in large part upon the testimony of the expert which he found to be "extraordinarily helpful in assessing all of this information. . . . I credit her testimony." Specifically he addressed points made by the expert regarding whether the witness was actively involved in the incident rather than being a bystander, whether the time during which the witness observed the assailant was stressful for the observer, the length of that period of observation, whether the witness's attention was distracted during the observation, and the amount of time that elapsed between the incident and the initial identification procedure. The judge found that Mr. Gorke's circumstances were positive in favor of an accurate identification for all but one of these factors.

For example, the judge, noted that Mr. Gorke was "actively . . . involved in the actual event" and therefore, as the expert noted, in those circumstances,

witnesses have "a greater recollection of what occurred." In addition, the judge noted that Mr. Gorke had an estimated three to five minutes to observe the person who would later try to take his phone and during that period, because it preceded the actual robbery attempt, it was not stressful for him and he was not distracted. All of those factors are positive in assessing the accuracy of the identification.

The only factor mentioned by the expert that the judge considered that was not positive was the length of time between the incident and the photo identification. The judge observed that there was a nine-day delay, but "the length of time between the event and the identification by itself does not mean that it is reliable or unreliable under these circumstance." The judge further observed that Mr. Gorke "testified in a very clear, precise, direct manner. . . . When he was unsure about a certain fact, he didn't try to stretch or make it bigger than what it was." In addition, the court concluded that the "testimony of the complaining witness . . . is credited," while noting that one-witness identifications are in many instances troubling, Mr. Gorke's identification "is not one of them." Moreover, noting there were some inconsistencies in Mr. Gorke's testimony, the judge remarked that the inconsistencies were related to Gorke's absence of memory due to the passage of time, and did not "undercut in any significant degree the

reliability of his identification." Finally, the judge noted that the witness made the identification "almost immediately" upon viewing the photo array and concluded that there was "nothing about the identification procedure that creates the type of subjectivity that would cause one [to] pause about the accuracy of the identification." There is ample support in the record for these findings and I fully agree with the majority's observation that Mr. Gorke's identification constituted "formidable evidence."

The majority, however, qualifies its "formidable evidence" assessment by describing it as only "arguably" so. The majority then determines that two circumstances present in this case are sufficient to override the trial judge's finding of the reliability of Mr. Gorke's identification. Specifically, the majority puts great stock in the fact that when Mr. Gorke was shown the photo of A.W., taken when he was stopped at the Gallery Place Station by Officer Ferguson approximately two-and-one-half hours after the offense, he testified that that the person depicted in that photograph (GovEx 8) was not the assailant. Second, the majority concludes that the government's claim that A.W. changed his appearance during the period between the offense and the taking of the photo was effectively disproved by Ferguson's testimony that he viewed a video of the arrival of the train

at Union Station as the incident was ending and saw that A.W. was already dressed as depicted in GovEx 8. While the former is not an insignificant point, it is not, in my view, forceful enough, by itself, to override the trial judge's finding that the identification was reliable. The second circumstance is entitled to no weight because it is not supported by the record and is refuted by Ferguson's own testimony. I will now address both points, considering the latter one first.

As noted, the majority argues that Ferguson testified that when he viewed the video of the train entering Union Station and the passengers moved from the car to the platform, he recognized A.W. who he said was wearing the long hair and boots as depicted in GovEx 8. He could not "clearly" see the face, however, and could not identify the person he saw in the video by what he saw of the face. That testimony is bolstered by an examination of the video which was taken from a distance and is of poor quality and which does not present a clear picture of the faces of any of those viewed. When Ferguson was asked: "[What] is it that you saw in the video that made you know which individual was [A.W.]?", he answered: "[t]he clothing that was being worn." Finally, when he was asked: "Had you not seen [A.W.] that evening . . ., looking at the [Union Station] video, would you have known that it was [A.W.]?" His answer was: "No." Based on that

testimony it cannot be doubted that Ferguson did not know how A.W. was dressed at the time of the incident and only identified A.W. in the video based on the clothes he was wearing later that evening. Therefore, there is no basis for concluding that Ferguson's testimony supported A.W.'s testimony or refuted the explanation given by the government that A.W. changed clothes and hair-do after the incident but before returning to the Metro.

The majority mainly relies on the fact that when shown GovEx 8, Mr. Gorke said that was not the person who tried to take his phone and that the person shown was the cross-dresser. I agree with the majority where it says it cannot be doubted that GovEx 8 is a photo of A.W. Indeed, when one places the photo of A.W. in the array next to the photo of A.W. taken the evening after the incident it is apparent, upon an examination of the two photos, together, that they are one and the same person. But in my view that fact is not decisive.

First, Mr. Gorke was not given the opportunity to look at the two photos together. Second, he had never seen GovEx 8 before that time and the record is not at all clear as to how long he looked at that photo. He emphasized that while he saw the photo array "within a week" (it was actually nine days) after the

incident, he was not shown GovEx 8 until nine months later. Finally, as the trial judge observed, there are major differences between the person depicted in GovEx 8 and the assailant as described by Mr. Gorke. For example the judge noted that Mr. Gorke described the assailant as wearing a brown coat and short hair. The person shown in GovEx 8 is wearing a different colored coat and what the judge characterized as a "wig" which, as noted above, extends several inches below the top of the shoulders. Based on these factors the judge concluded that the circumstances were consistent with the government's suggestion that A.W. went somewhere to change his appearance.

The majority, however, says that the change of clothes theory is improbable. In the video of his interview A.W. raises a similar point when he stated "he wouldn't have returned if he was guilty." Actually, it makes perfectly good sense that if one has committed a criminal offense, and he must return near to the place where the offense was committed, he would do whatever is necessary to disguise his appearance including exchanging clothing with someone else and donning a wig.

For all of these reasons, there was much to support the trial judge's conclusion that the identification was reliable. In addition, the trial judge noted

some inconsistencies between what A.W. said to Detective Ferguson and what he said in video of his interview and some inconsistencies between different statements made in the video. The judge concluded: "I do not credit the exculpatory nature of the statement made by the A.W." Another discrepancy, not mentioned by the trial judge is that in the video, as described above, A.W. stated that he wasn't wearing a wig and, touching his hair he stated "at Union Station that night I had long hair like this." As indicated, the judge concluded that A.W. was likely wearing a wig in GovEx8 and a comparison of that exhibit and the video clearly shows that the hair in GovEx 8 is much longer than A.W.'s hair as shown in the video. Thus, A.W.'s statement about the length of his hair at the time of the incident is refuted by GovEx 8.

In sum, Mr. Gorke was able to identify the photo of A.W. immediately when he was shown the array; he observed his assailant for between three and five minutes when he was not under any stress; and the trial judge, carefully weighing these and other factors, concluded that the testimony was credible and reliable. Moreover, the trial judge specifically rejected A.W.'s exculpatory statements and satisfied himself that Mr. Gorke's failure to recognize Mr. Gorke as the person appearing in GovEx8 was due to a faded memory caused by the passage of time

and the difference in the appearance of A.W. in the exhibit and the appearance of the assailant. Taken together these factors persuade me that the judge reasonably could "find the identification convincing beyond a reasonable doubt." *Benn II*, *supra*, 978 A.2d at 1265-66. Therefore, I respectfully dissent from the majority's decision to over-ride that determination.