*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-FS-0078

IN RE L.C., APPELLANT.

On Appeal from the Superior Court
of the District of Columbia
(2023-DEL-000737)

(Hon. Robert A. Salerno, Trial Judge)

(Argued September 16, 2025                    Decided December 18, 2025)

*Daniel Gonen*, with whom *Jaclyn S. Frankfurt* and *Mikel-Meredith Weidman* were on the brief, for appellant.

*Jeremy R. Girton*, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Graham E. Phillips*, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

Before BLACKBURNE-RIGSBY, *Chief Judge*, MCLEESE, *Associate Judge*, and THOMPSON, *Senior Judge*.

MCLEESE, *Associate Judge*: After a bench trial, the trial court adjudicated juvenile appellant L.C. delinquent based on a finding that L.C. committed acts constituting attempted voluntary manslaughter and related offenses. We affirm in part and reverse in part.

## I. Factual and Procedural Background

The evidence at trial included the following. In July 2023, then-sixteen-year-old L.C. and two of his companions got into a fight with Antonio Miles at the Fort Totten Metro Station. Two special police officers, Michael McGhee and Eshantee Braxton, were present on the platform at the time. The fight was captured from several angles by Metro surveillance cameras, and videos of the incident were admitted into evidence at trial. Testimony and video exhibits indicated that the fight began in a train car before quickly spilling out onto the platform, where Mr. Miles and one of L.C.'s companions—identified at trial by the grey hoodie he was wearing—fought for approximately one minute.

During the fight, Mr. Miles kicked the person in the grey hoodie and punched him in the head several times. The fight was "really violent," and Ms. Braxton felt "like there was a life or death energy to the fight." As Mr. Miles and the person in the grey hoodie fought, they moved from near the center of the platform to just below the ascending escalator. There, the person in the grey hoodie fell, and Mr. Miles punched him in the head several times. Meanwhile, L.C. and his companion stood by the base of the escalator, periodically kicking at Mr. Miles. The person in the grey hoodie scrambled to get up off the ground. As Mr. Miles struggled to hold the person in the grey hoodie from behind, a gun—it is not clear whose—fell to the

floor, very close to L.C.'s feet.  As the gun fell to the ground, so too did both Mr. Miles and the person in the grey hoodie.  L.C. quickly picked up the gun with both hands and aimed it at Mr. Miles.  Once on the ground, Mr. Miles began rolling away from L.C., and the person in the grey hoodie ran toward the ascending escalator.  As Mr. Miles continued to roll away, L.C. took a step toward Mr. Miles, raised his arms, and aimed the gun for a second time.  Mr. McGhee and Ms. Braxton both testified that L.C. fired two shots at Mr. Miles within a few seconds of each other, consistent with video exhibits that depicted L.C. twice aiming the gun at Mr. Miles in a shooting posture within the span of approximately two seconds.

Video exhibits indicated that, at about the same time L.C. apparently fired the second shot, Mr. McGhee drew his weapon and began shooting at L.C.  (Testimony at trial indicated that L.C. was shot several times.)  Mr. McGhee and Ms. Braxton both testified that Mr. McGhee shot at L.C. only after L.C. had fired two shots at Mr. Miles.  Mr. McGhee and Ms. Braxton also both testified that, once Mr. McGhee started shooting, L.C. ran up the ascending escalator along with his two companions.  As L.C. ran up the escalator, Mr. McGhee continued shooting at L.C.  While running up the escalator, L.C. turned and fired down toward the Metro platform.

After reaching the top of the escalator, L.C. and his companions ran to the Metro turnstiles.  L.C. initially ran to a closed turnstile, where he paused, doubled

over, and dropped the gun onto the floor. L.C. then stood up, turned, and left—without the gun—through an open turnstile that was under construction, took several steps toward the street, and collapsed. Mr. McGhee held L.C. at gunpoint until the police arrived.

After L.C. ran up the escalator, Ms. Braxton remained on the platform with Mr. Miles and applied pressure to a wound on Mr. Miles's back. About two minutes after L.C. and his companions fled up the escalator, Mr. Miles stood up without any aid from Ms. Braxton and walked up the ascending escalator on his own. Mr. Miles then unsuccessfully attempted to leave the Metro station through a closed turnstile. Mr. Miles eventually sat down, and then lay down, inside the station until a police officer arrived. The morning after the shooting, Mr. Miles underwent surgery to repair a gunshot-inflicted wound to his wrist. Two days after the surgery (and three days after the shooting), Mr. Miles returned to the emergency room, where he complained of pain and leg weakness. There was no evidence that Mr. Miles ever received treatment or hospitalization for his back wound.

The trial court made the following findings of fact at the conclusion of the bench trial. After Mr. Miles and the person in the grey hoodie had been fighting on the train platform for approximately one minute, a gun fell to the floor. L.C. picked up the gun, "immediately" pointed it at Mr. Miles, and fired a first shot. At that

instant, Mr. Miles was falling backwards and still appeared to be grabbing at the person in the grey hoodie. After he fired the first shot, L.C. stepped toward Mr. Miles and fired a second shot. Mr. Miles, then on the ground, was in the process of rolling his body away and had his back toward L.C. at the time of the second shot. After L.C. fired the second shot at Mr. Miles, Mr. McGhee began shooting at L.C., who subsequently shot backwards while running up the ascending escalator. L.C. did not fire at Mr. McGhee before Mr. McGhee fired at L.C.

Based on this evidence, the trial court found that the District of Columbia failed to establish that L.C. committed assault with intent to kill while armed. Specifically, because the situation was "muddled" by fear and imperfect defense of others, the trial court could not infer beyond a reasonable doubt that L.C. possessed an intent to kill. The trial court also found that the District failed to prove beyond a reasonable doubt that the first shot L.C. fired was not in reasonable defense of the person in the grey hoodie. The trial court found that the District did, however, prove beyond a reasonable doubt that L.C. did not act in reasonable defense of another when he fired the second shot "because it was not reasonable to believe that you could only save the person in the gray hoodie from death or serious bodily injury by using deadly force a second time." The trial court therefore found that L.C. committed attempted voluntary manslaughter and assault with a dangerous weapon. Finally, the trial court found that the District proved beyond a reasonable doubt that

L.C. committed assault causing significant bodily injury and various firearms offenses, including unlawful possession and discharge of a firearm.

## II. Sufficiency of the Evidence

L.C. raises several challenges to the sufficiency of the evidence to support the adjudications. We hold that the evidence was sufficient to support the adjudications for assault with a dangerous weapon and unlawful discharge of a firearm but insufficient to support the remaining adjudications.

## A. Standard of Review

Allegations of delinquency must be proven beyond a reasonable doubt. D.C. Code § 16-2317(c)(1). "In evaluating claims of evidentiary insufficiency in juvenile delinquency appeals, we view the record in the light most favorable to the [verdict], giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences." *In re As.H.*, 851 A.2d 456, 459 (D.C. 2004) (citation modified). "We will reverse on insufficiency grounds only when the District has failed to produce evidence upon which a reasonable mind might fairly find guilt beyond a reasonable doubt." *Id.* (citation modified).

"Nevertheless, the 'reasonable doubt' standard of proof is a formidable one. It requires the factfinder to reach a subjective state of near certitude of the guilt of

the accused." *In re As.H.*, 851 A.2d at 459 (citation modified). "Although appellate review is deferential, we have the obligation to take seriously the requirement that the evidence . . . must be strong enough that a [factfinder] behaving rationally really could find it persuasive beyond a reasonable doubt." *Id.* (citation modified). "Moreover, while the trier of fact is entitled to draw a vast range of reasonable inferences from evidence, [the trier of fact] may not base an adjudication of guilt on mere speculation." *Id.* (citation modified).

We will uphold the trial court's findings of fact unless "they are plainly wrong or without evidence to support them." *High v. United States*, 128 A.3d 1017, 1020 (D.C. 2015) (citation modified); D.C. Code § 17-305(a). In other words, we will displace a factual finding only if after reviewing the evidence we are "left with the definite and firm conviction that a mistake has been committed." *Johnson v. United States*, 232 A.3d 156, 167 (D.C. 2020) (citation modified).

We review the trial court's legal conclusions de novo. *Gay v. United States*, 12 A.3d 643, 648 (D.C. 2011).

## B.  Reasonable Self-Defense or Defense of Another

L.C. argues that the evidence was insufficient to establish beyond a reasonable doubt that the second shot was not in reasonable defense of himself or another. We disagree.

## 1. Background

Based on its conclusion that L.C.'s second shot was unreasonable, the trial court adjudicated L.C. delinquent for attempted voluntary manslaughter, assault with a dangerous weapon, assault causing significant bodily injury, and unlawful discharge of a weapon. Self-defense and defense of another are defenses to these charges. *See Bellamy v. United States*, 296 A.3d 909, 921 (D.C. 2023) (killing committed in lawful self-defense is not crime at all); *Parker v. United States*, 155 A.3d 835, 842 (D.C. 2017) (lawful self-defense is defense to assault); *Lee v. United States*, 61 A.3d 655, 657 (D.C. 2013) ("The right to defend a third person is analogous to the right of self-defense, and like self-defense, can provide a complete defense to criminal charges."); D.C. Code § 22-4503.01 (prohibiting discharge of pistol without permit, "[e]xcept as otherwise permitted by law, including legitimate self-defense").

The use of deadly force in self-defense or defense of another is lawful when the defendant subjectively believes that deadly force is required to prevent imminent death or serious bodily harm and that belief is objectively reasonable. *Richardson*

*v. United States*, 98 A.3d 178, 187 & n.11 (D.C. 2014). Even when the use of deadly force is both subjectively and objectively reasonable, the amount of force used must be reasonable rather than excessive. *Fersner v. United States*, 482 A.2d 387, 393 (D.C. 1984).

The objective reasonableness of an individual's exercise of force in self-defense or defense of another is analyzed through the lens of the individual's own circumstances, including what the individual perceived "while the heat of the conflict was on," *Brown v. United States*, 256 U.S. 335, 344 (1921), rather than with the benefit of hindsight, *Alcindore v. United States*, 818 A.2d 152, 157 (D.C. 2003) ("Under our law, the actor's subjective perceptions are the prime determinant of the right to use force—and the degree of force required—in self-defense, subject only to the constraints that those perceptions be reasonable under the circumstances. Indeed, the victim's personal perceptions are so significant that they may justify the use of reasonable, including deadly, force in self-defense even though it may afterwards have turned out that the appearances were false.") (citation modified).

The trial court found in this case that L.C. fired a second shot at Mr. Miles after Mr. Miles had fallen to the ground and the person in the grey hoodie had gotten clear of Mr. Miles, and while Mr. Miles had his back towards L.C. The trial court therefore concluded that "it was not reasonable [for L.C.] to believe that [he] could

only save the person in the gray hoodie from death or serious bodily harm by using deadly force a second time."

## 2. Disputed factual findings

L.C. argues that the trial court's finding that L.C. fired a second shot at all is not adequately supported by evidence, and L.C. may well have merely "pointed the gun at Mr. Miles without firing." L.C. also argues that even if he did fire a second shot, the record does not support a conclusion that that shot was fired at the moment the trial court found the shot was fired. We see no clear error. The trial court's finding that L.C. fired a second shot at Mr. Miles at the 7:37 mark in one of the videos is supported by the video evidence, which shows L.C. taking a step toward Mr. Miles, raising the gun with both arms, and aiming the gun at Mr. Miles with two hands, consistent with how L.C. held and fired the gun during the undisputed first shot. The trial court's finding is also supported by the testimony of Mr. McGhee and Ms. Braxton, who testified that L.C. fired two shots in relatively quick succession. In fact, L.C. did not contest at trial that he shot Mr. Miles twice.

Second, L.C. suggests that his second shot may have been fired after Mr. McGhee started shooting at L.C. and thus might have been in lawful self-defense. The record, however, amply supports the contrary conclusion that Mr. McGhee did not fire until after L.C. had fired two shots at Mr. Miles.

As L.C. points out, however, the trial court said arguably inconsistent things about the timing of L.C.'s second shot and Mr. McGhee's first shot. The trial court explicitly found at one point that Mr. McGhee fired his first shot one second after L.C. fired the second shot at Mr. Miles. The trial court later said that Mr. McGhee fired his first shot "at or around the same time or shortly after [L.C.] fire[d] his first shot at Mr. Miles." The second statement is ambiguous, and the two statements can be interpreted as being consistent because based on the trial court's other findings Mr. McGhee fired his first shot three seconds (which is certainly "shortly") after L.C.'s first shot. We decide this case based on the trial court's unambiguous finding, not the later rather ambiguous comment. *Cf., e.g.*, *In re Est. of Wright*, 196 P.3d 1075, 1081 (Wash. Ct. App. 2008) ("An unambiguous provision will not be controlled or modified by a doubtful or ambiguous provision.") (citation modified). We also note that if the trial court really meant to find that L.C.'s second shot was fired after Mr. McGhee fired his first shot, then the trial court ought to have considered whether L.C.'s second shot was fired in self-defense, which the trial court did not explicitly do. We think it appropriate to adopt the reading of the trial court's factual findings under which the trial court's legal analysis makes sense rather than a reading under which the trial court failed to adequately address a potential defense. *See generally, e.g.*, *Saidi v. United States*, 110 A.3d 606, 613 (D.C. 2015) ("Trial judges are presumed to know the law, and their rulings come to us with a

presumption of correctness.") (citation omitted). Finally, we note that L.C. has not asked this court to remand the record to the trial court for a clarification of the trial court's finding.

### 3. Reasonableness as a matter of law

L.C. also argues that the force he used was reasonable as a matter of law. L.C. further argues that the question whether the use of force in self-defense or defense of another was reasonable under given factual circumstances is an issue of law that this court must review de novo. In support of the latter argument, L.C. relies on *Gay*, 12 A.3d at 648 ("[T]he ultimate ruling as to whether the defendant used excessive force is a matter of law.") (citation modified). *Gay* does support L.C.'s argument, but we note that other of our cases appear to indicate that this court should defer to a factfinder's determination as to whether the use of force in given factual circumstances was or was not reasonable. *See, e.g.*, *Snell v. United States*, 754 A.2d 289, 291 (D.C. 2000) (in reviewing trial court's ruling in bench trial that defendant did not reasonably believe he was in imminent danger, this court concluded that it "cannot say the [trial] court erred in assessing the evidence as a reasonable fact-finder"). We need not resolve this issue, however, because even assuming that our review is de novo, we uphold the trial court's ruling that L.C.'s second shot was not reasonable.

When L.C. fired the second shot, Mr. Miles, who was not himself visibly armed, was on his hands and knees on the ground with his back facing L.C. and rolling away from both L.C. and the person in the grey hoodie. Even taking into account that L.C. was sixteen and acting in the heat of a violent episode, we agree with the trial court that it was unreasonable for L.C. to shoot a second time at Mr. Miles, who was apparently unarmed, on the ground, with his back to L.C., and not within immediate reach of either L.C. or the person in the grey hoodie.

L.C. asserts that, given the short amount of time (one or two seconds) that passed between the first and second shots, it must have been objectively reasonable for L.C. to fire the second shot because "defensive force remains justified even if it extends longer than necessary when viewed in hindsight." For support, L.C. cites *Brown*, 256 U.S. at 344, in which the Supreme Court stated that a defendant who fired another shot after the alleged assailant "was down" did not necessarily surrender self-defense because even "if the last shot was intentional and may seem to have been unnecessary when considered in cold blood, the defendant would not necessarily lose his immunity if it followed close upon the others while the heat of the conflict was on." *Id.*

We do not understand *Brown* to establish a flat legal rule that it is reasonable for a defendant to fire a second shot, no matter what the circumstances are at the

time of that shot, as long as a shot fired two seconds earlier was reasonable. The issue in *Brown* was not the sufficiency of the evidence, but rather whether the jury was adequately instructed about self-defense. 256 U.S. at 342-44. Moreover, there was evidence in *Brown* that the decedent was armed with a knife, had twice previously assaulted Mr. Brown with a knife, had threatened to kill Mr. Brown, and had been coming toward Mr. Brown with a knife, and that the final shot fired by Mr. Brown was fired inadvertently. *Id.* at 341-44. It was in that context, quite different from that of this case, that the Supreme Court merely commented that Mr. Brown "would not *necessarily* lose" the right of self-defense. *Id.* at 344 (emphasis added).

The other cases upon which L.C. relies are also distinguishable, either factually, legally, or both. *See, e.g., Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) (five-foot-three police officer who may have continued to shoot much larger six-foot-tall assailant charging her armed with hammer as he "fell to or lay on the ground" was entitled to qualified immunity; "While one might regret [the officer's] failure to stop shooting as soon as [her assailant] went down, immunity encompasses mistaken judgments.") (citation modified). None involves shooting an apparently unarmed individual as the individual fell to the ground and then taking a step toward the individual, as the individual rolled away, and shooting a second time into the individual's back. We also note that L.C. did not testify, as was of course his right, and thus there is no direct evidence in this case from L.C. about what he reasonably

perceived and why he chose to fire the second shot into Mr. Miles's back as Mr. Miles lay unarmed on the ground. In that respect too this case differs from many of the cases upon which L.C. relies.

One could debate whether L.C. acted reasonably even in firing the first shot, which was at an apparently unarmed man who was falling to the ground rather than, for example, simply threatening to shoot unless Mr. Miles stopped fighting with the man in the grey hoodie. We accept for current purposes, however, the trial court's conclusion that the District failed to prove beyond a reasonable doubt that the first shot was not in reasonable defense of another. (We do note that if L.C. is correct about our standard of review, the question whether the first shot was reasonable given the circumstances is an issue of law as to which we would owe no deference to the factfinder, not an issue of fact that the trial court was required to find beyond a reasonable doubt and as to which we owe deference.) Even on that assumption, we agree with the trial court's conclusion that the second shot was not reasonable. *Cf., e.g.*, *Roque v. Harvel*, 993 F.3d 325, 330, 333-39 (5th Cir. 2021) (holding that officer had qualified immunity with respect to first shot at armed person, but denying qualified immunity with respect to second and third shots, which were fired two and four seconds later, after person doubled over, dropped gun, and stumbled away from officer); *Cole Est. of Richards v. Hutchins*, 959 F.3d 1127, 1134 (8th Cir. 2020) (stating that it is clearly established law that "a few seconds is enough time to

determine an immediate threat has passed, extinguishing a preexisting justification for the use of deadly force"); *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1176 (10th Cir. 2020) ("Force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.") (citation modified); *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 413 (5th Cir. 2009) (stating that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased").

In sum, we uphold the trial court's determination that L.C.'s second shot was not reasonable. We therefore affirm the trial court's determinations that L.C. committed acts constituting assault with a dangerous weapon and unlawful discharge of a weapon.

## C. Intent to Kill as an Element of Attempted Voluntary Manslaughter

L.C. challenges the adjudication for attempted voluntary manslaughter, arguing that attempted voluntary manslaughter requires an intent to kill. Because the trial court found that the District failed to prove beyond a reasonable doubt that L.C. had the intent to kill, L.C. argues that this court should direct judgment in L.C.'s favor with respect to that offense. Although we view this as a challenging issue, we hold that attempted voluntary manslaughter requires either proof of the completed offense of voluntary manslaughter or proof of an intent to kill, neither of which was

shown in this case. We therefore reverse L.C.'s adjudication of delinquency for attempted voluntary manslaughter.

## 1. Standard of review and background principles

The District contends that L.C. did not properly raise in the trial court the argument that attempted voluntary manslaughter requires an intent to kill. A plea of not guilty in a bench trial, however, automatically preserves "a full range of challenges" to the sufficiency of the evidence, including "challenges to the requisite elements of the crime." *Carrell v. United States*, 165 A.3d 314, 326 (D.C. 2017) (en banc) (citation modified). Because L.C. contested all of the charges against him at trial, we decide de novo whether attempted voluntary manslaughter requires proof of an intent to kill.

The District of Columbia Code does not statutorily define the elements of voluntary manslaughter. D.C. Code § 22-2105; *Comber v. United States*, 584 A.2d 26, 35 (D.C. 1990) (en banc). Rather, "manslaughter is defined . . . by reference to the common law." *Williams v. United States*, 569 A.2d 97, 98 (D.C. 1989). "[A] homicide constitutes voluntary manslaughter where the perpetrator kills with a state of mind which, but for the presence of legally recognized mitigating circumstances, would render the killing murder." *Comber*, 584 A.2d at 42. The states of mind that can support a conviction for voluntary manslaughter are "intent to kill," intent to "do

serious bodily injury," and "conscious disregard of an extreme risk of death or serious bodily injury." *Id.* at 47.

One mitigating circumstance that can reduce an offense from murder to voluntary manslaughter is "imperfect" self-defense or imperfect defense of another: "typically when the defendant honestly believed [the defendant] needed to use lethal force . . . , but the belief was not objectively reasonable." *Bassil v. United States*, 147 A.3d 303, 307 n.7 (D.C. 2016); *see also Lee*, 61 A.3d at 657 ("The right to defend a third person is analogous to the right of self-defense . . . ."); *Swann v. United States*, 648 A.2d 928, 932-33 (D.C. 1994) (actual but erroneous belief that use of force was necessary to protect oneself is mitigating circumstance that reduces murder to voluntary manslaughter).

Subject to an exception that neither party has argued applies in this case, it is a crime to attempt to commit another crime. D.C. Code § 22-1803. We therefore take as a given for purposes of this appeal that attempted voluntary manslaughter is an offense in the District of Columbia.

The elements of attempt are not specified by statute. D.C. Code § 22-1803 (referring to "attempts" without further definition). This court therefore has looked to the common law to determine the scope of the attempt statute. *E.g.*, *United States v. Fleming*, 215 A.2d 839, 840-41 (D.C. 1966); *see generally, e.g., Clark v. United*

*States*, 418 A.2d 1059, 1061 (D.C. 1980) ("In absence of a statutory definition of the elements of the crime, we look to the common law."). This court has described in various ways the type of conduct that suffices to constitute a criminal attempt. *See, e.g.*, *Washington v. United States*, 965 A.2d 35, 43 & n.24 (D.C. 2009) (discussing three formulations: "conduct reasonably adapted to the accomplishment of the intended crime[]"; conduct "com[ing] within dangerous proximity of completing the crime"; and conduct that is "a substantial step towards completion of the crime") (citation modified); *Stroman v. United States*, 878 A.2d 1241, 1245 (D.C. 2005) ("doing of some act toward [crime's] commission that goes beyond mere preparation"); *Evans v. United States*, 779 A.2d 891, 894 (D.C. 2001) ("overt act . . . which, except for some interference, would have resulted in the commission of the crime") (citation modified). L.C., however, argues only that he lacked the mental state required to support a conviction for attempted voluntary manslaughter, and he does not contest that his conduct was otherwise sufficient to constitute an attempt. We therefore need not address the latter issue.

The parties do contest the necessary mental state for attempt crimes. L.C. argues that a conviction for attempt to commit a crime requires proof that the defendant intended to commit, i.e., had the purpose to commit, that crime. The District argues that a conviction for attempt to commit a crime requires proof only that the defendant had whatever mental state is required to establish guilt of that

crime. Each party cites cases from this court arguably providing support for its view. *Compare*, *e.g.*, *Smith v. United States*, 813 A.2d 216, 218-19 (D.C. 2002) (holding that attempted second-degree child cruelty does not require proof of intent to injure child; "[W]hen an attempt is proven by evidence that the defendant committed the crime alleged to have been attempted, the intent required to commit the crime of attempt can be no greater than the intent required to commit the completed crime."), *with, e.g.*, *Brawner v. United States*, 979 A.2d 1191, 1193-94 (D.C. 2009) (holding that although offense of escape does not require proof that defendant intended to escape, offense of attempted escape does require proof of intent to escape).

We have previously suggested that our precedents on this issue are "conflicting." *Williams v. United States*, 130 A.3d 343, 347 (D.C. 2016), *on rehearing*, 210 A.3d 734 (D.C. 2019). Our task in this case is to sort through our precedents to determine the current binding law of the District of Columbia on the specific issue we confront: When an offense does not require proof of intent in the sense of purpose, and instead can be established by proof of some lesser mental state, such as that the defendant acted knowingly, maliciously, recklessly, or negligently, does the offense of attempt to commit that crime require proof of a purpose to commit the crime or instead does it suffice to show that the defendant acted with the mental state required to establish the crime at issue? Answering that question is not an easy task.

We first note some general principles that provide the framework for our analysis. First, as a division of the court, we must follow the prior holdings of the court. *E.g.*, *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971). We are not required to follow language that is dicta. *E.g.*, *Punch v. United States*, 377 A.2d 1353, 1360 (D.C. 1977).

Second, "for purposes of binding precedent, a holding is a narrow concept, a statement of the outcome accompanied by one or more legal steps or conclusions along the way that . . . are necessary to explain the outcome; other observations are dicta." *Diamond v. Hogan Lovells US LLP*, 224 A.3d 1007, 1019 (D.C. 2020) (citation modified). Legal principles adopted by the court "after explicit analysis" and then "relied upon as the basis of a decision constitute binding authority." *N'jai v. U.S. Dep't of Educ.*, 342 A.3d 1217, 1220 (D.C. 2025) (citation modified); *see also Seminole Tribe v. Florida*, 517 U.S. 44, 67 (1996) ("As a general rule, the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law.") (citation modified).

Third, language in an opinion does not constitute a holding on an issue unless the court was focused on that precise issue. *See, e.g.*, *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994) ("The rule of *stare decisis* is never properly invoked unless in

the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question.") (citation modified).

Fourth, general language in an opinion must be understood in the context of the case in which the language appears. *See, e.g.*, *Cohens v. Virginia*, 19 U.S. 264, 399 (1821) ("[G]eneral expressions . . . are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."); *see also, e.g.*, *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) ("General expressions transposed to other facts are often misleading.").

## 2. Analysis

L.C. argues that it was settled long ago in this jurisdiction that a conviction for attempting to commit a crime requires "the intent to commit the crime." *Sellers v. United States*, 131 A.2d 300, 301 (D.C. 1957). "Intent," however, is an "ambiguous and elastic term." *United States v. Bailey*, 444 U.S. 394, 404 (1980); *see also, e.g.*, 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.2 at 457 (3d ed. 2018) ("The meaning of the word 'intent' in the criminal law has always been rather

obscure . . . .”). Black’s Law Dictionary defines “intent” as “the state of mind accompanying an act, [especially] a forbidden act.” *Intent*, *Black’s Law Dictionary* (12th ed. 2024). Acknowledging the “obscurity” of prior terminology, the Model Penal Code defines “intentionally” or “with intent” as “purposely.” *Model Penal Code* §§ 1.13(12), 2.02 cmt. 1 (A.L.I. 1985). The ambiguity of the term “intent” means that general statements that attempt requires intent do not squarely answer the specific question we confront in this case, because such statements may mean either that attempt requires purpose to commit the underlying crime or instead merely that attempt requires proof of the mental state required by the underlying crime. When we use the term “intent” in this opinion, we will be explicit about the sense in which we are using the term.

Moreover, many offenses require proof of intent in the sense of purpose, and it thus is often true that proof of attempt to commit an offense requires proof of intent in the sense of purpose to commit that offense. For example, assault with intent to kill requires that the defendant acted with a purpose to kill. *E.g.*, *Logan v. United States*, 483 A.2d 664, 670-71 (D.C. 1984) (offense of assault with intent to kill requires proof that defendant “act[ed] with the purpose or conscious intention of causing the death of another”). The parties in this case would doubtless agree that attempted assault with intent to kill also requires a purpose to kill. The issue presented in this case arises concretely only as to offenses that do not require intent

in the sense of purpose. For that reason, general statements about attempt and intent made as to offenses requiring intent in the sense of purpose do not resolve the issue we confront.

The District relies on cases holding that "[e]very completed criminal offense necessarily includes an attempt to commit that offense." *Ray v. United States*, 575 A.2d 1196, 1199 (D.C. 1990). As the District points out, it follows from such cases that "when an attempt is proven by evidence that the defendant committed the crime alleged to have been attempted, the intent required to commit the crime of attempt can be no greater than the intent required to commit the completed crime." *Smith*, 813 A.2d at 219. As we explained in *Smith*, "[t]o hold otherwise would create the anomalous result that [defendants] could be convicted of the completed crime . . . but, on the same facts, could not be convicted of an attempt to commit that same crime." *Id.*

The principle that proof of a completed offense necessarily establishes guilt of an attempt to commit that crime does not suffice to resolve this case, however, because the shooting in this case was not fatal and L.C. thus was not proven to have committed the completed offense of voluntary manslaughter. The District argues more broadly that an attempt crime can never require a more culpable mental state than the underlying offense requires. There is a strand of reasoning in *Smith* that

arguably tends to support the District of Columbia's argument. In the paragraph immediately preceding the paragraph holding that proof of a completed offense necessarily establishes guilt of attempt to commit that offense, the court in *Smith* reasons as follows: (1) the concept of specific intent can be "somewhat misleading," 813 A.2d at 219; *see also*, *e.g.*, *Perez Hernandez v. United States*, 286 A.3d 990, 1000 (D.C. 2022) (en banc) (noting criticisms of and concerns about use of term "specific intent"); (2) attempt generally requires "intent to commit the offense allegedly attempted," *Smith*, 813 A.2d at 219; (3) proof of attempt does not require proof of all elements of the completed offense, *id.*; and (4) therefore, "we hold that the government had to prove only that appellant intended to commit the acts which resulted in the injury (or the grave risk of injury) to the child, not that he had a specific intent to injure the child," *id.*

For several reasons, we do not interpret this paragraph in *Smith* as binding authority establishing the broad principle that in all cases, including where the completed crime has not been proven, proof of the mental state required by the completed offense suffices to establish proof of attempt. First, *Smith* was a case in which the completed offense was proven, 813 A.2d at 219, and it thus was not necessary for the court in *Smith* to address the question of the mental state required for attempt offenses where the completed offense has not been proven. *See, e.g.*, *Diamond*, 224 A.3d at 1019 (describing holdings as principles "necessary to explain

the outcome") (citation modified). Thus, the holding in *Smith* is appropriately understood as the narrower principle that proof of attempt to commit an underlying crime can be established by proof that the defendant completed the underlying crime.

Second, when the court in *Smith* later summed up its holding, it did so narrowly rather than broadly. 813 A.2d at 220 ("[W]e hold that proof of the crime of second-degree cruelty to children is sufficient to convict a defendant of attempted second-degree cruelty to children.").

Third, our subsequent decisions have focused on the narrower holding and rationale of *Smith*. *See, e.g.*, *Lee v. United States*, 831 A.2d 378, 381 n.5 (D.C. 2003) ("[E]very completed criminal offense necessarily includes an attempt to commit that offense.") (citation modified; citing *Smith*).

Finally, as we will explain more fully, adopting a broad reading of *Smith* would put *Smith* in conflict with a later decision of the court. Where reasonably possible, we should avoid interpreting our decisions to be conflicting. *See, e.g.*, *Citizens for Resp. & Ethics in Washington v. Fed. Election Comm'n*, 993 F.3d 880, 893 (D.C. Cir. 2021) ("When faced with a claim of conflicting precedents, we must whenever possible harmonize later decisions with existing authorities to avoid creating unnecessary conflicts."); Bryan A. Garner et al., *The Law of Judicial*

*Precedent* § 36, at 300 (2016) (stating that apparently conflicting decisions from same court "should be harmonized" "if at all possible") (citation modified).

The potentially conflicting later decision is *Brawner*, 979 A.2d at 1192-93. In that case, Mr. Brawner was convicted of escape from the D.C. Jail based on evidence that he put on civilian clothes, went into an unauthorized area of the jail, fled from correctional officers, attempted to leave the secure area of the jail, fled again, and was apprehended before leaving the jail. *Id.* at 1192-93. The escape statute by its own terms applies to attempts to escape. *Id.* at 1193 (citing D.C. Code § 22-2601(a)(1) ("No person shall escape or attempt to escape . . . .")). Because he failed to succeed in escaping from the jail, Mr. Brawner was prosecuted on the theory that he had attempted to escape. *Id* at 1193.

On appeal, Mr. Brawner argued that the jury should have been instructed that he could be found guilty of attempting to escape only if he was proven beyond a reasonable doubt to have intended to escape. *Brawner*, 979 A.2d at 1193. This court agreed with Mr. Brawner. *Id.* at 1193-94. The court acknowledged that a conviction for completed escape did not require proof of intent to escape and instead could rest on proof that the defendant knew that defendant's conduct would result in the defendant leaving physical confinement without permission. *Id.* at 1194. The court held, however, that "attempted escape, like other inchoate offenses, requires the

mental state of intending to commit the underlying offense." *Id.*; *see also id.* ("[H]eightened culpability has been thought to merit special attention" in "the law of inchoate offenses such as attempt.") (citation modified) (quoting *Bailey*, 444 U.S. at 405).

The District suggests that *Brawner* should be interpreted as limited to the escape statute rather than as a general holding about the law of criminal attempt. We disagree. As previously indicated, *Brawner* rests on general principles of law applicable to attempt as an inchoate crime, not on special features of the offense of escape. 979 A.2d at 1193-94.

Thus, we read our cases, taken together, to establish the following binding principle of law: in general, attempt offenses can be established in either of two ways: (1) proof of all of the elements of the underlying completed offense; or (2) proof of conduct constituting attempt (which as we have previously noted has been formulated various ways) combined with proof that the defendant acted with the purpose to commit the underlying offense. This approach to reconciling this court's cases is supported by three additional considerations.

First, the approach better aligns the law of this court with the holding of the Supreme Court in *Braxton v. United States*, 500 U.S. 344, 351 n.* (1991). In *Braxton*, the Supreme Court held that when Congress uses the term "attempt" in a

criminal statute, Congress incorporates the common-law element of "specific intent to commit the unlawful act." *Id.* *Braxton* applied that principle to attempted murder, concluding that attempted murder requires proof of intent to kill. *Id.* ("Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill.") (citation modified). We assume that the holding of *Braxton*, which interprets a federal statute in light of common-law principles, is not directly binding on this court, but we give the Supreme Court's decision significant weight. *See, e.g.*, *Fraternal Ord. of Police, Metro. Police Dep't Lab. Comm. v. District of Columbia*, 52 A.3d 822, 829 (D.C. 2012) ("This court is not bound by federal courts interpreting federal law, but we generally consider applicable federal court precedent as persuasive authority when interpreting a local provision that is substantially patterned on a federal statute.") (citation modified); *cf. Cardozo v. United States*, 315 A.3d 658, 666 (D.C. 2024) (en banc) ("[E]ven dicta of the Supreme Court has persuasive force . . . .").

Second, this approach better aligns the law of this court with the approach to criminal attempt taken by what appears to be the substantial weight of authority in other jurisdictions. *See, e.g.*, *Dixon v. State*, 772 A.2d 283, 301 (Md. 2001) (holding that attempted voluntary manslaughter requires intent to kill). *But see, e.g.*, *Williams v. State*, 123 So. 3d 23, 24 (Fla. 2013) (attempted manslaughter does not require intent to kill).

Third, this approach finds substantial support from commentators. As one leading treatise explains,

> [A]ttempt liability requires a heightened mental element that goes beyond what is required for the completed offense. . . . The rationale for the heightened mens rea requirement is that the lack of a completed offense can sow doubt about the defendant's true desires; requiring a heightened mens rea ensures that the defendant is only convicted when they acted with a true criminal purpose. In this sense, the heightened mens rea requirement for attempt compensates for the lower act requirement.

1 Jens David Ohlin, *Wharton's Criminal Law* § 7.3 at 186 (16th ed. 2021) (citation modified); *see also* 2 LaFave, *Substantive Criminal Law* § 11.3 at 293 ( "The crime of attempt consists of (1) an intent to do an act or to bring about a certain consequence which would in law amount to a crime; and (2) an act in furtherance of that intent. Under the prevailing view, an attempt thus cannot be committed by recklessness or negligence or on a strict liability basis, even if the underlying crime can be so committed."); *cf. Wharton's Criminal Law* § 7.3 at 182 ("For example, although a murder may be committed without an intent to kill (based on extreme indifference or implied malice), an attempt to commit murder generally requires a specific intent to kill.").

We acknowledge a concern raised by the concurring opinion in *Jones v. United States*, 124 A.3d 127, 134 n.4 (D.C. 2015) (Beckwith, J.). That opinion expressed the view that, contrary to the conclusion we have reached in this case, the

decision in *Brawner* cannot be distinguished from the decision in *Smith* because "the elements of a crime are determined by what offense the government charges, not by what evidence it presents at trial." *Id.* We see that matter differently. When a defendant is charged with attempt, it follows from our holding that the jury can find guilt on either of two bases: (1) proof of all elements of the underlying completed offense; or (2) proof that the defendant engaged in conduct constituting attempt and acted with the purpose to commit the underlying offense.

The holding in *Brawner* does, however, raise a potential issue as to how attempt offenses should be charged when the underlying offense does not require proof of intent in the sense of purpose. In general, a charge of attempt may be presented to the jury based on a document charging that the defendant completed the underlying offense. Super. Ct. Crim. R. 31(c)(2). Where the underlying offense does not require proof of intent in the sense of purpose, however, a potential issue arises because of the separate requirement that the charging document must contain the "essential facts constituting the offense." Super. Ct. Crim. R. 7(c)(1); s*ee also, e.g.*, *Snell v. United States*, 68 A.3d 689, 696 (D.C. 2013) (An impermissible "constructive amendment occurs when the trial court permits the jury to consider, under the indictment, an element of the charge that differs from the specific words of the indictment.") (citation modified). Thus, in a case in which the underlying offense does not require proof that the defendant acted with intent in the sense of

purpose, keeping open the possibility of having attempt submitted to the jury may require that the charging document allege that the defendant acted with intent in the sense of purpose.

Finally, we flag an issue that we do not decide. The Model Penal Code in certain circumstances provides that defendants can properly be convicted of attempt based on a finding that the defendant acted with belief rather than purpose. *Model Penal Code* § 5.01(1)(b) & cmt. 2, at 304-05. The District has not relied on that approach in this case, and the trial court made no finding that L.C. believed that his shot would result in Mr. Miles's death. We therefore have no occasion to express a view as to whether in some circumstances a conviction for attempt can rest on proof of a defendant's belief rather than purpose.

In sum, we hold that establishing attempted voluntary manslaughter in this case required proof that L.C. intended to kill Mr. Miles. Because the trial court found that L.C. had not been proven to have intended to kill Mr. Miles, we reverse L.C.'s adjudication of delinquency for attempted voluntary manslaughter.

## D. Significant Bodily Injury

L.C. argues that the evidence was insufficient to establish that Mr. Miles suffered a significant bodily injury from the second shot that L.C. fired. We agree, and we therefore reverse the adjudication for assault with significant bodily injury.

At the time of the shooting in this case, significant bodily injury was defined as "an injury that requires hospitalization or immediate medical attention." D.C. Code § 22-404(a)(2) (2023). The trial court found significant bodily injury stemming from the wound to Mr. Miles's back inflicted by the second shot. In support of the finding of significant bodily injury, the trial court relied on "the video of Mr. Miles, which shows his injuries, his self-reports of pain, his apparent pain in the video, and the medical records introduced at trial."

There is no evidence that Mr. Miles was ever treated for the back wound, either when he initially went to the hospital after the shooting (where he received immediate treatment for the wrist wound) or when he returned days later. Although medical records from three days after the shooting refer to "increased pain and bilateral leg weakness s/p GSW to lower back," there is no indication that Mr. Miles required hospitalization or any medical attention for his back. Without evidence of treatment, neither the existence of some pain nor the loss of some blood is by itself sufficient to establish significant bodily injury. *See Wilson v. United States*, 140 A.3d 1212, 1215, 1217-20 (D.C. 2016) (individual who "appeared to be in visible

pain" and was "gushing" blood did not suffer significant bodily injury); *see also Quintanilla v. United States*, 62 A.3d 1261, 1262-66 (D.C. 2013) (individual in "a lot of pain" did not suffer significant bodily injury). Furthermore, "wounds created by a bullet are not *per se* significant bodily injuries." *Nero v. United States*, 73 A.3d 153, 158 (D.C. 2013).

The District argues that Mr. Miles's bullet wound to the back resembles the wound at issue in *Nero*, where a victim who was shot "at close range" through his bicep, causing "obvious pain and bleeding," was found to have suffered a significant bodily injury. 73 A.3d at 156, 158 (citation modified). In *Nero*, however, a doctor testified that the wound could have been "life-threatening" without medical intervention. *Id.* at 158. There was no such testimony in this case. *See Wilson*, 140 A.3d at 1218 (government's evidence failed to establish significant bodily injury in part because "government did not elicit testimony from any paramedics or treating physicians, who could have explained whether [the] injuries required medical treatment to prevent longterm physical damage") (citation modified). We do not mean to imply that medical testimony is always required to prove significant bodily injury. *See, e.g., Belt v. United States*, 149 A.3d 1048, 1056 (D.C. 2016) (factfinder can draw reasonable inferences about necessity of medical treatment; "Neither the felony assault statute nor our case law requires any additional evidence (such as medical or other expert witnesses) to substantiate that the immediate medical

attention that the victim received was actually necessary."). Our holding more narrowly is that the absence of such evidence here, coupled with the otherwise limited evidence introduced, results in a record that is insufficient to support a finding that Mr. Miles's back injury rose to the level of a significant bodily injury.

The District argues that follow-up treatment can establish the existence of significant bodily injury. *See, e.g.*, *Brown v. United States*, 146 A.3d 110, 115-16 (D.C. 2016) (blows to head and leg requiring subsequent CAT scan, limitation of activities, and follow-up appointment constituted significant bodily injury). There is no evidence, however, that Mr. Miles actually received or was recommended to receive any follow-up treatment. Rather, the evidence was only that Mr. Miles returned to the emergency room and complained of pain. Visiting a doctor is not alone sufficient to establish significant bodily injury. *See Quintanilla*, 62 A.3d at 1264 ("The fact that an injured party immediately goes to a hospital or seeks other medical attention is not, in itself, determinative . . . .").

For the foregoing reasons, we reverse L.C.'s adjudication of delinquency for assault causing significant bodily injury.

### E.  Firearm Possession and Carrying Charges

L.C. contests his adjudication of delinquency for carrying a pistol without a license, possessing a firearm without registration, and unlawfully possessing ammunition, arguing that the evidence was insufficient to establish his involvement in those charges because his temporary possession of the firearm was in lawful self-defense and defense of another. We agree, and we therefore reverse the adjudications of guilt for those firearm offenses. We note that L.C. does not challenge the adjudication for unlawful discharge of a firearm on this basis.

Self-defense can be a complete defense to otherwise illegal possession and carrying of a firearm. *Evans v. United States*, 304 A.3d 211, 213 (D.C. 2023). We take as a given that the same is true with respect to defense of a third party. *See generally Lee*, 61 A.3d at 657 ("The right to defend a third person is analogous to the right of self-defense, and like self-defense, can provide a complete defense to criminal charges."). The trial court found that L.C. fired at least three shots during the incident: a first shot at Mr. Miles, which was *not* beyond a reasonable doubt unlawful; a second shot, also at Mr. Miles, which *was* unlawful beyond a reasonable doubt; and one or more additional shots while running up the escalator, which were *not* beyond a reasonable doubt unlawful, given that L.C. was at that point "being shot at multiple times by an unknown person." Determining that L.C. was not acting lawfully at the moment he fired the second shot, the trial court adjudicated L.C. delinquent for possession and carrying offenses.

One week after the verdict in this case, this court held in *Evans* that "persons who procure a firearm in lawful self-defense are not criminally liable for possessing it so long as they dispossess themselves of the weapon with reasonable promptness after the need for self-defense has subsided." 304 A.3d at 224. L.C. argues that his adjudication of delinquency was erroneous as a matter of law in light of *Evans*. We hold that under the reasoning of *Evans* the evidence does not permit a finding that L.C. committed the firearms charges in dispute.

As threshold matter, the District argues that the legality of L.C.'s possession and carrying charges is not reviewable on appeal because L.C. invited any legal error. We disagree that L.C. invited the trial court's understandable failure to apply the standard later adopted in *Evans*. Although L.C.'s argument in the trial court did not foresee the standard we adopted in *Evans*, L.C. did argue at one point that his possession of the firearm was lawful until he dropped the firearm.

The District does not dispute that the trial court's finding that L.C. was involved in the firearms offenses at issue rested upon reasoning that is inconsistent with the standard adopted in *Evans*. Rather, the District argues that (1) any review in this court should be solely for plain error and (2) at most L.C. would be entitled to a remand for the trial court to make additional findings in light of *Evans*. We disagree on both points.

First, as previously noted, a plea of not guilty in a bench trial automatically preserves challenges to the sufficiency of the evidence. *Carrell*, 165 A.3d at 326.

Second, we conclude that, given the other findings of the trial court, the evidence was insufficient to support a finding that L.C.'s possession and carrying of the firearm were unlawful. The trial court reasoned that L.C.'s possession was not lawful at the moment that L.C. fired the unlawful second shot, but *Evans* makes clear that lawful possession and lawful use of force are not coextensive. 304 A.3d at 224 (holding that innocent-possession defense applies as long as defendants dispossess themselves of weapon at issue "with reasonable promptness after the need for self-defense has subsided"). In this case, we conclude as a matter of law that a period of temporary possession was clearly lawful before and after the second shot given that both the first and third shots were not found to be unreasonable. As a matter of law, L.C.'s possession and carrying of the gun during the very brief interval—no more than ten seconds—between firing the first shot in defense of the person in the grey hoodie and firing the third shot in self-defense were permissible. That is particularly true given that L.C. could not reasonably have been expected to drop the gun in immediate proximity to Mr. Miles, who had been assaulting L.C.'s companion, or Mr. McGhee, who was shooting at L.C.

The sole remaining issue is whether L.C.'s dropping of the gun at the turnstile about twenty seconds after L.C. fired the last shot on the escalator constituted reasonably prompt dispossession. Acknowledging that *Evans* stated that the question of "[w]hat amounts to reasonable promptness in the particular circumstances is often a question for the jury to decide," 304 A.3d at 224, we nevertheless hold that as a matter of law L.C. dispossessed himself of the gun with reasonable promptness. L.C., who had himself been shot several times, dropped the gun after doing nothing more than continuing to run away for a few seconds after shooting back in what the trial court found was lawful self-defense. L.C. clearly dispossessed himself of the firearm with "reasonable promptness" after the need for lawful self-defense subsided. *Evans*, 304 A.3d at 214. We therefore reverse L.C.'s adjudication of delinquency for the firearm possession and carrying charges.

For the foregoing reasons, we affirm the adjudications for assault with a dangerous weapon and unlawfully discharging a firearm, reverse the adjudications for the remaining offenses, and remand the case for further proceedings.

*So ordered.*